UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 18-CR-20031 |
| STEPHAN CAAMANO, | ) ) ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING COMMENTARY**

The United States recommends Defendant Stephan Caamano be sentenced to a term of imprisonment of 210 months, to be followed by a three-year term of supervised release. Such a sentence is sufficient but not greater than necessary to address Caamano's conduct in the above-captioned cause, the seriousness of the offense, and the other factors outlined in 18 U.S.C. § 3553(a).

Utilizing dark-web markets from March 2017 through May 2018, Caamano trafficked millions of counterfeit Xanax pills to customers throughout the United States. This scheme garnered Caamano millions of dollars in profits, while placing a significant number of persons at risk from pills that were manufactured in the garage of Caamano's residence. The serious nature of Caamano's conduct, his blatant disregard for public safety, as well as the breadth of his infringement on Xanax's trademark holder, necessitates a high-end guideline sentence.

I. **Sentencing Hearing**

The United States has no remaining objections to the revised presentence report

("PSR"). The PSR accurately reflects Caamano's offense conduct and the procedural history of this case.

Additionally, the government does not intend to call any witnesses or present any evidence during sentencing. The evidence on which the government seeks to rely during the sentencing hearing is contained within the PSR.

## II. The Sentencing Guidelines and § 3553(a) Factors

The United States agrees with the calculated guideline range of 168 to 210 months, as described in the PSR. As discussed below, this range appropriately considers the breadth of Caamano's criminal actions, the danger in which those actions placed the public, and the damage to Xanax's trademark holder.

In determining a sentence, the court should first calculate the accurate advisory guideline range. The court should then consider the factors laid out in 18 U.S.C. § 3553(a), which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for:

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...

(5) any pertinent policy statement:

> (A) issued by the Sentencing Commission ...

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Considering Caamano's extensive criminal actions in light of the § 3553(a) factors, a high-end guideline sentence is appropriate in the present case.

### A. The Guideline Range Is Appropriately Calculated in the PSR

Under the United States Sentencing Guidelines (USSG), a guideline range of 168 to 210 months is correct and appropriate in the present case, based on an offense level of 35 and a criminal history category of I.

1. <u>USSG's Relevant Guidance</u>

On April 29, 2019, Caamano pleaded guilty to each of the seven counts alleged in the superseding indictment. As described in Paragraphs 38 and 39 of the revised PSR, these seven counts group for purposes of the guidelines calculations, pursuant to USSG § 3D1.2(c). The applicable guideline range is then governed by the most serious count; that is, the count with the highest offense level. In the present case, the most serious count is Count 4s, Laundering of Monetary Instruments. Therefore, the guideline range for this case is governed by the calculation for this count.

a. USSG's applicable formula

The applicable guideline range for Laundering of Monetary Instruments under USSG § 2S1.1 is calculated by first determining the offense level for the underlying criminal activity from which the laundered funds were derived, then adding to that offense level any relevant special offense characteristics. § 2S1.1(a)(1) and (b). In the present case, Caamano obtained the illicit funds he then laundered by trafficking in counterfeit Xanax pills. Therefore, the applicable guidelines for criminal infringement of a copyright or trademark, as provided in USSG § 2B5.3, must be determined.

Under § 2B5.3, the offense level for criminal infringement of a trademark is (1) a base offense level of 8 to which (2) the infringement amount involved is added. In cases where the infringing items are "identical or substantially equivalent to the infringed item," the infringement amount is calculated using the retail value of the *infringed* item and multiplying it by the number of *infringing* items. USSG § 2B5.3, Application Note 2(A)(i).

In the present case, the infringed items are Pfizer's Xanax pills, and the infringing items are the counterfeit pills manufactured by Caamano. Undisputed by the parties, Caamano's counterfeit pills are substantially identical in appearance to Pfizer's Xanax pills. Thus, § 2B5.3, Application Note 2(a)(i) governs, and the initial calculation of Caamano's guidelines is a base offense level of 8, to which is added the product of the retail value of Pfizer's Xanax pills multiplied by the number of pills manufactured by Caamano.

b. Number of infringing items

There is no dispute between the parties as to the number of counterfeit pills manufactured by Caamano. As described in the revised PSR at Paragraph 23, a conservative estimate of the number of counterfeit pills Caamano manufactured is 4,333,333. While the true number is likely higher, the parties agree this number is appropriate to use in calculating the applicable guideline range.

c. Value of infringed items

Pfizer does not maintain records of the retail value of their Xanax pills. Rather, the company maintains the wholesale acquisition cost of their pills – that is, the price at which a manufacturer sells each pill to wholesale distributors. During the time frame in which Caamano was actively manufacturing counterfeit Xanax pills, the wholesale acquisition cost (WAC) was as follows: $9.44/pill from March 2017 through May 2017; $10.33/pill from June 2017 through December 2017; and $11.30/pill from January 2017 through May 2018.  These figures are undisputed by the defendant. In calculating the applicable guideline range, the U.S. Probation Office used the average of these figures, $10.33/pill, as the value of each infringed item in the present case. Thus, the 4,333,333 number was multiplied by $10.33 to determine the infringement amount and, subsequently, the applicable offense level.

For the reasons detailed below, the wholesale acquisition cost (WAC) is an appropriate value to use in place of the retail value for purposes of calculating the applicable guidelines in this case. The WAC considers the true value of each Xanax pill to Pfizer, by encompassing the research, development, and safety measures

5

surrounding the drug. Further, this value has been used in similar cases in lieu of the retail price of pills when the counterfeit drugs were being sold nationally. *See, e.g., United States v. Beuschel*, 662 Fed. Appx. 818, 823 (8th Cir. 2016) (affirming use of the WAC of Viagra in calculating the guideline range for trafficking of counterfeit Viagra). Therefore, the revised PSR's use of the WAC of Xanax in the present case to calculate the applicable offense level is appropriate.

B. **Caamano's Objections to the Guideline Calculations Are without Merit**

As noted above, Caamano does not dispute either the number of pills manufactured by Caamano or the wholesale acquisition cost (WAC) value utilized in the guideline calculations in the PSR. Rather, Caamano objects to the USSG's formula itself – that is, he contends the use of the retail value or the wholesale acquisition cost to determine the infringement amount is improper. Upon review, however, Caamano's arguments are without merit.

Caamano's objection to the infringement value formula is included in the addendum to the revised PSR, as well as in the report drafted by his expert, Dr. William Trombetta. Through these, Caamano argues that the formula provided by § 2B5.3 of the USSG is incorrect and should be ignored by this Court. Instead, Caamano encourages use of a new formula. He contends that the infringement amount used to determine the applicable offense level should be based on the lost profits by the trademark owner, Pfizer. Caamano fails, however, to provide a single lost profits value for this Court to use, instead providing several alternative values that result in an offense level of 27 or 31. Regardless of which of these figures Caamano ultimately encourages this Court to

rely on, the profits lost by Pfizer are improper to use in determining his sentence.

    1.  <u>Use of Pfizer's Lost Profit Fails to Address Caamano's Actions</u>

Caamano argues in part that the profits lost by Pfizer as a result of Caaamano's criminal activities most accurately reflect the harm Pfizer experienced. Based on this, he contends use of Pfizer's lost profits in the guideline calculation is the best measure for the infringement to the company's trademark. This argument, however, is without merit or support, because (1) public policy requires that the retail or wholesale acquisition cost value of Xanax be used rather than lost profits; (2) the retail value, rather than lost profits, is unambiguously used in the USSG's guideline calculations; and (3) case law shows that lost profits has not been relied on by courts in calculating guidelines in similar cases.

First, Caamano's argument that this Court should use the profit loss to Pfizer in calculating the applicable guidelines flies in the face of the policies guiding punishment in the criminal justice system. As clearly noted in the Background to § 2B5.3, the Commission and the USSG "treats copyright and trademark violations much like theft and fraud." When products are stolen from a business, punishment for that theft is premised not on the actual lost profits to the company, but rather based on the retail value of the stolen items. Similarly then, the infringement on a company's trademark or copyright should not be limited to the profit loss experienced by the company, but rather on the value of the infringed items – that is, the retail value of the copied product. Caamano's infringement of Pfizer's trademark should be "treat[ed]. . . like theft." Thus, the punishment should be based on the value of the items stolen, not merely on the

7

profit loss Pfizer experienced as a result of Caamano's criminal activities.

Secondly, the Guidelines are abundantly clear as to the formula to be used in infringement cases such as this. As described above, Section 2B5.3, Application Note 2, specifically provides that the infringement value is to be calculated using the retail value of the product being counterfeited. Neither § 2B5.3 itself nor the application notes associated with it contemplate relying on lost profits to the company whose copyright or trademark was infringed upon.

Third and finally, case law supports the use of the retail value or wholesale acquisition cost of Xanax in the present case. Retail values or wholesale acquisition costs have been consistently used in similar cases in which an individual was selling counterfeit pharmaceuticals. *See, e.g., United States v. Hollis,* 666 Fed. Appx. 798 (11th Cir. 2016) (affirming use of retail price of $29.50/pill in guideline calculation for counterfeit Viagra case); *United States v. Hucks*, 2013 WL 654397 (EDPA 2013) (using the retail price of $22/pill and $29/pill for counterfeit case involving Viagra and Cialis); *Beuschel*, 662 Fed. Appx. at 823 (affirming use of the $38/pill wholesale acquisition cost in the guideline calculation for case involving trafficking of counterfeit Viagra). The United States is unaware of any cases in which the profit loss to a pharmaceutical company was used to determine the guideline range when sentencing a defendant for trafficking in counterfeit pharmaceuticals, nor does Caamano provide any such support to this Court.

Despite Caamano's attempts to craft a wholly unique guideline formula for the present case, public policy, the Guidelines, and case law all support use of the retail

value or the wholesale acquisition cost in calculating the applicable guideline range.

2. <u>Use of Wholesale Acquisition Cost in Guideline Calculation is Appropriate</u>

Caamano also contends that the retail price for a pharmaceutical drug simply cannot be known and, therefore, cannot be used in guideline calculations. Because insurance companies and managed care programs lower the prices consumers pay for drugs and because pharmaceutical companies sell drugs in groups rather than individually, Caamano contends that the retail price "is inappropriate [to use to determine infringement value] given that no customer actually pays List Price [*sic*] for a drug."

As described above, however, the list price is not the price on which the United States seeks to rely. Rather, the PSR calculates the applicable guidelines based on the wholesale acquisition cost of the Xanax pills that were copied by Caamano. The average WAC for these pills during the time Caamano was manufacturing his counterfeit pills was $10.33 per pill. The WAC figures were provided directly by Pfizer, for their Xanax, 2mg pills during the relevant time period and are undisputed by the parties.

The WAC is an appropriate value to use in place of the retail value in calculating the applicable guidelines. Use of this figure comports with the purposes laid out by the Sentencing Commission, and the WAC value is undisputed by the parties and has been used in a case similar to the one at bar.

First, use of the WAC comports with the treatment of Caamano's offense as a theft, as described in the USSG and above. The WAC encapsulates the actual value of

9

each Xanax pill to Pfizer, while simultaneously avoiding several of the concerns Caamano raises in his objections. The WAC figure includes the cost to Pfizer for development of the Xanax drug, the costs of the strict safety standards the company has in place to protect consumers of the medication, and the multitude of other costs inherent in the manufacturing and creation of a pharmaceutical drug. Yet it is also independent of market factors such as insurance or managed care companies, and is a consistent figure nationally and therefore is the same in each state to which Caamano's counterfeit pills were being sent. Therefore, the WAC is an appropriate measure of the infringement to Pfizer by Caamano and his counterfeit pills.

Further, the WAC is uncontested by the defendant. While Caamano objects to the use of this figure in the guideline calculation, he does not contest the accuracy of the WAC figure itself. At the same time, Caamano fails to provide a single alternative value for the Court to use in calculating the applicable offense level.  Rather, he presents multiple theoretical lost profit figures to this Court in his objections to the PSR, and asks the Court to choose one to use in calculating the guidelines. The WAC, however, is a single, known figure on which this Court may confidently rely in determining the applicable offense level in this case.

Finally, the WAC of Viagra was used in a strikingly similar case, with approval by the Eleventh Circuit. In *United States v. Beuschel*, 662 Fed. Appx. 818, a defendant was convicted of trafficking large quantities of counterfeit Viagra pills to customers across the United States. *Id.* at 820. At the time of this criminal activity, the WAC price of Viagra was approximately $38 per pill, whereas the defendant was selling his

counterfeit tablets for $2 per pill. *Id.* at 823. The Eleventh Circuit noted with approval the district court's use of the WAC of Viagra in calculating the applicable guidelines. *Id.* at 823, 830. Therefore, use of the same value in the present case is not unique, but rather an appropriate approach that avoids several of Caamano's concerns relating to use of the retail value of Xanax.

Relying on the undisputed values discussed above, the applicable offense level in the present case is 35. PSR, ¶ 50. The base offense level is 8, to which 22 levels are added (4,333,333 pills x $10.33/pill = $44,763,329.90 infringement value). *Id.* at ¶ 40. Four additional levels are added due to the defendant's conviction under § 1956 and his use of sophisticated laundering methods. USSG § 2S1.1(b)(2) and (3). This offense level of 38 is decreased by three levels due to the defendant's acceptance of responsibility under § 3E1.1(a) and (b), resulting the an offense level of 35.

### C. A Within-Guidelines Sentence Is Appropriate

The applicable guideline range is, as described above, appropriately calculated, and the § 3553(a) factors support a sentence within these guidelines. The serious nature of this offense, the steps Caamano took to avoid detection and continue his criminal activities, and the danger inherent in the present offense necessitate a lengthy term of imprisonment.

1. <u>Nature and Circumstances of the Offense</u>

First, the nature and circumstances of the present offense support a lengthy penalty. During the fourteen months of this offense, Caamano was distributing huge quantities of a counterfeit medication to individuals across the country. As described in

the PSR, a very conservative estimate of the number of pills manufactured and sold by Caamano is 4.3 million units, and the actual number is likely significantly higher. These pills were shipped to persons from California to Connecticut, in quantities ranging from 1,000 pills per package up to 1 million. The sheer breadth of Caamano's scheme necessitates a lengthy sentence.

In addition to the breadth of his criminal activities, the product Caamano chose to manufacture and sell also raises serious concerns. Caamano intentionally manufactured medication identical in appearance to Pfizer's Xanax, such that unsuspecting individuals viewing the pills could easily have believed they were, in fact, true Xanax. Yet Caamano's manufacturing process had none of the safeguards or checks pharmaceutical companies are required to adhere to under the FDA. Caamano was a young man with limited training in chemistry, who chose to create counterfeit medication in his unsanitary garage, and did so in vast quantities. Further, he created these pills by purchasing controlled substances from abroad, trusting those unmonitored companies to provide safe chemicals.

The potential harm Caamano's actions could have wrought to an unknowing public should be of significant concern to any who learn of his activities, and necessitate a serious and lengthy prison sentence.

  2. <u>History and Characteristics of the Defendant</u>

Caamano's characteristics similarly suggest a lengthy prison sentence is appropriate. Though Caamano has no prior criminal convictions, the steps he took to avoid detection by law enforcement in the present case suggest his criminal activities

were not a simple lapse in judgment, but were the result of calculated decision-making.

As described in the revised PSR, Caamano took several steps to conceal his criminal activities. Caamano created a limited liability company to hide his purchase of the house he used as a base of operations. PSR ¶ 27. Further, Caamano's use of the darkweb and cryptocurrency – both developed primarily to encourage anonymity and limit detection by authorities – and his reliance on significant security measures built into his home computer are only a few of the active steps Caamano took to allow him to continue acting criminally without interference by police. Finally, personal notes found on his computer describe his plan to move to Portugal using the proceeds of his criminal activities. *Id.* at ¶ 30. These actions are not those of a one-time offender who simply had a lapse in judgment. Rather, they demonstrate a clear knowledge of the criminal justice system and an intent to continue his criminal scheme long-term.

3.  Need for a Significant Sentence

Finally, the facts of this case make clear the need for a serious sentence. Caamano's sentence must deter not only him, but also deter others from participating in similar dangerous schemes. Additionally, the seriousness of his activities and the need to protect the public similarly necessitate a lengthy sentence.

Caamano utilized darkweb markets and cryptocurrency to coordinate and operate his scheme. The darkweb is an international network used by persons interested in maintaining anonymity and avoiding detection. Though not wholly made up of illegal activities, a significant percentage of the darkweb markets involve the sale or purchase of illicit goods, due to the built-in protocols of the darkweb that impede law

enforcement investigations. Similarly, cryptocurrency is a largely untraceable electronic currency developed to hinder monitoring by any governmental body.

Use of the darkweb is widespread, particularly for illicit purposes. Deterring persons from using darkweb markets and cryptocurrency to conduct illegal businesses is important, and imposing a within-guideline sentence in the present case would aid in that endeavor. The need for deterrence is particularly true when viewing the product Caamano chose to sell through these methods. Pharmaceuticals are closely monitored and regulated by the FDA and similar government agencies due to the risks inherent in their development, manufacturing, and use. A lengthy sentence is appropriate in the present case to deter not only Caamano but also others from participating in the trafficking of counterfeit pharmaceuticals, particularly through the darkweb markets.

Based on the above, a within-guideline imprisonment term is appropriate in the present case. A sentence at the top of the applicable guideline range of 210 months appropriately reflects the serious nature of the defendant's conduct in this case, the dangers he posed to the public by his actions, and also provides sufficient deterrence to the defendant and others who may be inclined to act similarly.

III.    **Conclusion**

Based on the foregoing reasons, the United States respectfully requests a sentence of 210 months imprisonment be imposed in the present case, to be followed by a three-year term of supervised release. Such a sentence is sufficient, but not greater than necessary, to achieve justice and meet the goals described in § 3553(a). The United States recommends this sentence be imposed as follows, with each term served

concurrently:

>   *Count 1.* A term of imprisonment of 210 months, followed by a three-year term of supervised release; no fine; and a $100 special assessment.
>
>   *Counts 2 and 3.* A term of imprisonment of 60 months, followed by a three-year term of supervised release; no fine; and a $100 special assessment.
>
>   *Counts 4 and 5.*  A term of imprisonment of 210 months, followed by a three-year term of supervised release; no fine; and a $100 special assessment.
>
>   *Counts 6 and 7.*  A term of imprisonment of 120 months, followed by a three-year term of supervised release; no fine; and a $100 special assessment.

The United States also respectfully requests a final order of forfeiture be entered reflecting the terms in the preliminary order of forfeiture entered by this Honorable Court on October 11, 2019.

>   Respectfully submitted,
>
>   JOHN C. MILHISER
>   UNITED STATES ATTORNEY
>
>   *s/ Rachel E. Ritzer*
>   Rachel E. Ritzer, Illinois Bar No. 6309905
>   Assistant United States Attorney
>   201 S. Vine St., Suite 226
>   Urbana, IL 61802
>   Phone:  (217) 373-5875
>   Fax:  (217) 373-5891
>   rachel.ritzer@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF on January 2, 2020, which will provide notice of this filing to counsel of record.

*s/ Rachel E. Ritzer*
Rachel E. Ritzer, Assistant U.S. Attorney